UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THREE FIVE COMPOUNDS, INC.,

                        Plaintiff,                  **MEMORANDUM**
                                             **OPINION AND ORDER**

      v.

SCRAM TECHNOLOGIES, INC.,                 11 Civ. 1616 (RJH)

                         Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Richard J. Holwell, District Judge

      Defendant Scram Technologies, Inc. ("STI") moves pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss this contract action brought by Three Five Compounds, Inc. ("Three Five") for lack of personal jurisdiction. For the reasons that follow, the motion is GRANTED.

## BACKGROUND

      STI is a Maryland corporation with its principal place of business in Maryland. (*See* Compl. ¶ 4; Aff. of R. Kwong, June 9, 2011 (Kwong Aff.) ¶¶ 1,3.) STI is an optical engineering company that produces advanced projector displays, some of which use light emitting diodes, or LEDs. (*Id.* ¶ 5.)

      For some time prior to 2009, STI had used LED chips produced by Cree, Inc., a company based in Durham, North Carolina. (*Id.* ¶ 6.) In early 2009, STI decided to increase production of certain advanced projectors using LEDs. Ray Kwong, STI's President, contacted Cree to determine whether Cree could meet STI's increased demand for LED chips. (*Id.* ¶¶ 7-8.) Cree referred STI to Three Five, its exclusive distributor of

LED chips in the United States.  (*Id.* ¶¶ 8-9; Aff. of P. Guan, July 11, 2011 ("Guan Aff.") ¶ 5.)  Three Five is a New York corporation with its principle place of business in New York, New York.  (Compl. ¶¶ 1-3.)

STI contacted Three Five by telephone regarding the amount and kind of LED chips that it needed.  (Kwong Aff. ¶ 11; Guan Aff. ¶ 6.)  Three Five confirmed that it could provide LED chips with the required specifications.  (Kwong Aff. ¶ 11.)  Over the ensuing several weeks, STI and Three Five personnel had a series of telephone conversations and exchanged numerous e-mails.  (Guan Aff. ¶ 7.)

These discussions resulted in an agreement whereby STI would purchase 1.2 million LED chips for $2.16 million.  (Guan Aff. ¶ 9; Kwong Aff. ¶ 11, Ex. C; Compl. ¶ 14 .)  Three Five would deliver the LED chips to STI in Maryland in monthly shipments to be completed no later than one year from the date of the agreement.  (Guan Aff. ¶ 9; Kwong Aff. ¶ 11.)  On October 8, 2009, STI e-mailed Three Five a purchase order to that effect.  (*See* Kwong Aff. Ex. C; Compl. ¶ 10.)  No meeting between STI officers on the one hand and Three Five officers on the other took place in New York or anywhere else prior to the execution of the written purchase order.

On October 13, 2009 and February 17, 2010, Three Five delivered to STI sample shipments of LED chips.  (Compl. ¶ 15, 18; Kwong Aff. ¶ 12; Guan Aff. ¶ 11.)  STI issued checks for these shipments which Three Five deposited in bank accounts in New York.  (Compl. ¶¶ 17, 20; Guan Aff. ¶¶ 12-13.)

The parties' accounts differ as to what happened next.  According to STI, tests revealed that the chips did not meet the required specifications and STI cancelled its

order.  (Kwong Aff. ¶ 12.)  For its part, Three Five alleges that it "prepared all materials ordered and designated by SCRAM TECH in the Agreement" and "has fully preformed all of its obligations under the agreement."  (Compl. ¶¶ 21-22.)  In Three Five's account, STI "refused to set a time for delivery and payment" and "demanded that the specifications for the chips needed to be changed and required a narrower range of frequencies," demands that "were completely inconsistent with the purchase order." (Guan Aff. ¶¶ 19-20.)

The parties do agree, however, that in March and April 2010, Three Five executives met in New York with N. Wayne Bailey, Vice President of Sales for STI, to discuss "issues as to delivery and the specifications of the LED chips in the purchase order agreement."  (Guan Aff. ¶¶ 14-15; Aff. of N. W. Bailey, June 10, 2011 ("Bailey Aff.") ¶ 1.)

On March 11, 2010, Bailey and Three Five General Manager Peter Guan met at the Cornell Club in Manhattan.  (Bailey Aff. ¶ 8.)  According to Bailey, "the conversation was general in nature" and Guan assured him that he "would be able to view the LED chips after the meeting."  (*Id.* ¶ 9.)  However, at the end of the meeting, Guan told Bailey that "Three Five had customers in the building and that it was not . . . a good time [to] see the LED chips."  (*Id.*)

Guan does not dispute this account.  In a sworn affidavit, however, he avers that at this meeting Bailey presented "his Scram Tech business card with his contact information, which included his Brooklyn, New York office address and telephone number" and said "that he conducts his Scram Tech business from his office" at that

address.  (Guan Aff. ¶¶ 17-18.) However, Guan has not produced the business card from the meeting.

In response, STI has submitted an affidavit from Bailey in which he avers that he "neither had in [his] possession nor presented to Three Five [] a[n] STI business card with a New York address and/or New York telephone number located on it." (Aff. of N.W. Bailey, July 21, 2011 ("Bailey Reply Aff.") ¶ 5.)  Bailey's affidavit attaches an STI business card with his name and an address and telephone number in for STI in Maryland. (*See id.* Ex. 1.)

In his reply affidavit, Bailey further avers that he and Guan "discussed, at length, the building in which [he] reside[s] which was formerly the old Daily News Plant and which has since become a residential condominium" that houses 36 Chevrolet Corvettes belonging to the Pop artist Peter Max.[1] (*Id.* ¶ 9.) According to Bailey, due to his interlocutors' interest in these cars, he "sometimes hand[s] out [his] 'private social card' so that those who are generally interested in the building/corvettes [] can obtain additional information about the same." (*Id.*)  Bailey speculates that, in talking to Guan about his residence, he "may have" given Guan his private social card. (*Id.*)  Bailey's affidavit also attaches a copy of his private social card. (*See id.* Ex. 3.) The card lists a

---

[1] The "Peter Max Corvettes" are a set of 36 Chevrolet Corvettes, one for each year from 1953—the first year that Chevrolet built the Corvette—through 1989. That year, the Corvettes were awarded to the winner of a contest sponsored by the television network Vh1. The winner of the contest later sold the cars to Peter Max who planned to paint them as part of an art project. When Max did not carry the project through, he stored the Corvettes in a garage at a building in Brooklyn that formerly housed the Daily News printing plant. *See generally* Daniel McDermon, *'Vette Set: An Artist's Dream Collection Relocates*, N.Y. Times, Feb. 11, 2010, at AU1.

telephone number with a Manhattan area code and does not list any address other than the phrase "New York. NY." (*See id.*)

On April 1, 2010, Bailey and Three Five President Thomas Guan met at a Starbucks in New York. According to Bailey, he and Guan "exchanged pleasantries and discussed some of the issues surrounding STI's issues with LED chips" but that Guan "was focused on shipping the LED chips to STI immediately." (Bailey Aff. ¶¶12-13.) Three Five points to no evidence that contradicts Bailey's account.

Three Five does, however, point to other communications. Guan's sworn affidavit further avers that STI officers "placed many telephone calls to Three Five's offices in New York" and sent "hundreds of e-mails" to Three Five regarding the purchase order. (Guan Aff. ¶¶ 22-23.) In addition, Guan avers that Three Five arranged a testing meeting at Cree to show that the LED chips did meet STI's specifications but STI did not send any representative to the meeting. (*Id.* ¶ 21.) Bailey avers that these allegations are "grossly exaggerated in number by Three Five and unsupported by the record." (Bailey Reply Aff. ¶ 18.) No record of any communications between Three Five and STI appears in the record.

On March 9, 2011, Three Five filed this action alleging that STI breached the purchase order agreement by refusing to take delivery of additional shipments of LED chips. On June 10, 2011, Defendants moved [8] under Federal Rule of Civil Procedure 12(b)(2) to dismiss the action for lack of personal jurisdiction.

## LEGAL STANDARD

"The burden of establishing jurisdiction over a defendant, by a preponderance of the evidence, is upon the plaintiff." *Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985). "If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of personal jurisdiction over defendant. . . ." *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). In that procedural posture, "all pleadings and affidavits are construed in the light most favorable to plaintiff, and where doubts exist, they are resolved in the plaintiff's favor." *Hoffritz for Cutlery, Inc.*, 763 F,2d at 57.

"A court sitting in diversity applies the law of the forum state in determining whether it has personal jurisdiction over the defendants." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996). Hence "[t]o determine whether it has personal jurisdiction over" STI, "the Court engages in a two-part inquiry. First, it must determine whether there is personal jurisdiction over" STI "under New York state law; second, if New York law provides for personal jurisdiction, the Court must determine whether the assertion of jurisdiction comports with the constitutional requirements of due process." *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F. Supp. 2d 391, 396 (S.D.N.Y. 2004).

Sections 301 and 302 of the New York Civil Procedure Law and Rules—together, New York's so-called long-arm statute—govern personal jurisdiction over foreign defendants. STI relies on Section 302(a)(1), which provides that "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in

person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state. . . ."  N.Y.C.P.L.R. § 302(a)(1).  "For a court to exercise jurisdiction under this provision, the claim must 'arise from' the transaction of business within the state."  *Agency Rent a Car*, 98 F.3d at 29.  Thus "[t]he long-arm statute gives New York personal jurisdiction over a nondomiciliary if two conditions are met:  first, the nondomiciliary must 'transact business' within the state; second, the claim against the nondomiciliary must arise out of that business activity."  *Cutco Indus., Inc.*, 806 F.2d at 365.

"The overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York."  *Ehrenfeld v. Bin Mahfouz,* 881 N.E.2d 830 (N.Y. 2007).  "Although it is impossible to precisely fix those acts that constitute a transaction of business . . . it is the quality of the defendants' New York contacts that is the primary consideration."  *Fischbarg v. Doucet*, 880 N.E.2d 22, 26 (N.Y. 2007).  This emphasis on "a certain quality, rather than a specific quantity, of contacts with the forum," *United States Theatre Corporation v. Gunwyn/Lansburgh Ltd. Partnership*, 825 F. Supp. 594, 596 (S.D.N.Y. 1993), means that "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Deutsche Bank Secs., Inc. v. Montana Bd. of Inv.*, 850 N.E.2d 1140, 1142 (N.Y. 2006).

However, that one transaction can be enough does not mean that one contact is always enough.  "Generally, telephone, fax, and mail between an out-of-state defendant and a New York party in the course of contract negotiations will not confer jurisdiction unless the defendant used communications with New York as a means of projecting himself into the local commerce."  *Premier Lending Servs., Inc. v. J.L.J. Assocs.*, 924 F. Supp. 13, 16 (S.D.N.Y. 1996) (quotation marks omitted); *see also Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 956 F. Supp. 1131, 1135 (S.D.N.Y. 1997) ("[C]ontacts through telephone calls, the mail, and by facsimile are usually insufficient to confer personal jurisdiction.").  Rather, "communications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself."  *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y.2005).

Of course, though "[n]o single event or contact connecting defendant to the forum state need be demonstrated," visits to New York "are not jurisdictionally insignificant," *Cutco Industries, Inc.*, 806 F.2d at 365, 367, and "the location of a meeting where the terms of an allegedly breached contract are negotiated carries jurisdictional significance." *Premier Lending Servs., Inc.*, 924 F. Supp. at 16-17.  Yet there is nothing talismanic about a visit to New York, either.  "Although a visit to the forum is a presumptively more significant contact that a phone call or letter, it too must be 'purposeful' in order to sustain jurisdiction." *United States Theatre Corp.*, 825 F. Supp. at 596.  Thus, like the number of contacts, "[v]isits to the forum are also of variable significance for the jurisdiction analysis." *Id.*

8

In that regard, again, the touchstone is quality.  "Courts have been . . . skeptical of attempts to assert personal jurisdiction over a defendant based on a single meeting in New York, especially where that meeting did not play a significant role in establishing or substantially furthering the relationship of the parties."  *Posven, C.A.*, 303 F. Supp. 2d. at 398; *see also Cooper, Robertson & Partners, LLP v. Vail,* 143 F. Supp. 2d 367, 372 (S.D.N.Y. 2001) (noting that "a single meeting in New York will rarely provide the basis for jurisdiction pursuant to § 302(a)(1), especially when that meeting does not result in the execution of a contract").  Rather, "[i]n order for meetings in New York which are subsequent to the formation of the contractual relationship to confer jurisdiction, the meetings must be essential to the business relationship or at least substantially advance it."  *Kahn Lucas Lancaster, Inc.*, 956 F. Supp. at 1136.

Applying that standard, "[w]hen the visit . . . is not for the purpose of initiating or forming a relationship, but is to alleviate problems under a preexisting relationship, New York courts have declined to assert jurisdiction."  *United States Theatre Corp.*, 825 F. Supp. at 596; *see also Cutco Indus, Inc.*, 806 F.2d at 368 (treating certain meetings after the formation of a contract as "irrelevant" because "attempts to renegotiate an existing contract do not constitute a CPLR 302 'transaction of business'"); *PaineWebber Inc. v. WHV, Inc.*, No. 95 Civ. 0052, 1995 WL 296398, at *3 (S.D.N.Y. May 16, 1995) (stating that "occasional meetings in the forum state that are exploratory, unproductive or insubstantial are insufficient to establish requisite contacts with the state"); *Gen. Instrument Corp. v. Tie Mfg, Inc.*, 517 F. Supp. 1231, 1232 (S.D.N.Y. 1981) (stating that "attempts . . . to compromise or adjust a dispute as to performance are not sufficient to

confer *in personam* jurisdiction upon the courts of New York with respect to a pre-existing contract over which no jurisdiction existed prior to the settlement attempts").

In the context of a breach of contract claim, "[s]everal factors should be considered in determining whether an out-of-state defendant transacts business in New York, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004). "Although all are relevant, no one factor is dispositive." *Agency Rent a Car*, 98 F.3d at 29. Rather, "the ultimate determination is based on the totality of the circumstances." *Id.* Those circumstances include "[a]cts performed by a defendant subsequent to the execution of a contract. . . ." *Cutco Indus., Inc.*, 806 F.2d at 367.

With respect to the second requirement that "the claim against the nondomiciliary must arise out of that business activity," *Cutco Industries, Inc.*, 806 F.2d at 365, "New York law does not require that the acts constituting the breach of contract take place in New York." *Hoffritz for Cutlery*, 763 F.2d at 59. It is also "unnecessary that final negotiations or indeed execution of the contract take place in New York." *Id.* at 60. "Rather, having established that defendants transacted business in New York, plaintiffs need show only that the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject

the defendants to suit in New York." *Id.* at 59.  Thus "[a] claim arises out of a defendant's transaction of business in New York when there exists a substantial nexus between the business transacted and the cause of action sued upon."  *Agency Rent a Car*, 98 F.3d at 31 (quotation marks omitted).  Since "[t]wo elements give rise to a breach of contract claim:  (i) a contract between the parties and (ii) an act allegedly in violation of that agreement," whether such a claim arises out the defendant's transaction of business turns on the relationship between that transaction and the contract itself as much as between the transaction and the breach.  *Id.*

"If there is a statutory basis for jurisdiction, the court must then determine whether New York's extension of jurisdiction in such a case would be permissible under the Due Process Clause of the Fourteenth Amendment."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002).  "To do so," courts "undertake an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry."  *Id.*

"The first of these tests asks whether the defendant 'has "certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."'"  *Id.*  (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 152 (2d Cir. 2001)) (quoting *Calder v. Jones,* 465 U.S. 783, 788 (1984)) (alteration in original; some internal quotation marks omitted).  "Where," as is alleged here, "the claim arises out of, or relates to, the defendant's contacts with the forum . . . minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being haled into court there." *Bank Brussels Lambert*, 305 F.3d at 127 (quotation marks omitted).

"The second part of the [constitutional] jurisdictional analysis asks 'whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice—that is, whether it is reasonable under the circumstances of the particular case." (quotation marks omitted). *Id.* at 129. The Second Circuit has instructed courts "to consider five factors in evaluating reasonableness: '(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.'" *Id.* (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir. 1996)).

## DISCUSSION

The Court will begin its jurisdictional analysis by considering the four factors the Second Circuit has found most relevant. Two of those factors—the existence of a New York choice of law clause and "whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state"—do not provide any support for finding personal jurisdiction. *Sunward Elec., Inc.*, 362 F.3d at 22. The contract at issue contains no such provisions. Accordingly, if the Court has personal jurisdiction, that jurisdiction would be grounded in "an on-going contractual relationship with a New York corporation" or the fact that "after

executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship."  *Id.*

In that regard, Three Five points to three types of contacts that STI allegedly had with New York:  (1) telephone and e-mail communications by STI officers with Three Five officers in New York; (2) the two meetings with Bailey in New York; and (3) a business card that Bailey gave Peter Guan that allegedly listed a New York address.[2]  The Court considers each type of contacts in turn.

### 1.  Telephone and E-Mail Communications

First, Three Five's General Manager Peter Guan avers that he and Thomas Guan "had dozens of telephone conversations with Mr. Bailey in New York"; that several STI officers "placed many telephone calls to Three Five's office in New York" both during negotiations and after contract formation; and that these officers sent "hundreds of e-mails" to Three Five in New York.  (Aff. of P. Guan, July 11, 2011 ("Guan Aff.") ¶¶ 7, 16, 22-23.)  Because the Court must take the plaintiff's sworn assertions as true, it is willing to set aside that Three Five has not produced any record of any e-mail or call

---

[2] Peter Guan's affidavit also refers to several activities that Three Five conducted in New York, including making shipments from New York to STI in Maryland and depositing checks in corporate bank accounts in New York.  *See* Guan Aff. ¶¶ 11, 13.)  However, "the plaintiff's activities within the State are not attributable to the defendants because they were not in any way directed by the defendants."  *Kimco Exch. Place Corp. v. Thomas Benz, Inc.*, 824 N.Y.S.2d 353, 354 (2d Dep't 2006).  Hence "[t]he appropriate focus of an inquiry under CPLR § 302(a)(1) is on what the non-domiciliary defendant[s] did in New York and not on what the plaintiff[ ] did."  *Int'l Customs Assocs., Inc. v. Ford Motor Co.,* 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995).

between its officers and STI.   Nevertheless, assuming such communications occurred, they did not amount to the transaction of business under Section 302(a)(1).

"Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction."   *Int'l Customs Assocs. v. Ford Motor Co.,* 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995) (citing cases), *aff'd,* 201 F.3d 431 (2d Cir. 1999), *cert. denied,* 530 U.S. 1264 (2000); *see also Sayles Biltmore, Inc. v. Soft-Fab Tex., Inc.*, 440 F. Supp. 1010, 1013 (S.D.N.Y. 1977) (stating that "the notion that mailing copies of letters from out of state to New York amounts to 'transaction of business' . . . is altogether unfounded" and that "[i]nterstate negotiations by telephone do not subject the caller to the jurisdiction of the receiver").   Hence "New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York."   *Beacon Enter., Inc. v. Menzies,* 715 F.2d 757, 766 (2d Cir. 1983); *see also Carlson v. Cuevas*, 932 F. Supp. 76, 78 (S.D.N.Y. 1996) ("The mere existence of defendant's telephone calls into New York are not sufficient to sustain New York long arm jurisdiction.").

Instead, those courts have held that "[t]elephone calls are significant only if they are used by the defendant to actively participate in business transactions in New York." *Carlson*, 932 F. Supp. at 78; *see also PaineWebber Inc.*, 1995 WL 296398, at *3.  Again, the prevailing rule is that "communications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center

14

of gravity inside New York, into which a defendant projected himself." *Maranga,* 386 F. Supp. 2d at 306.

*Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506 (N.Y. 1970) "is the leading New York case in which this sort of projection was held to have occurred." *Maranga,* 386 F. Supp. 2d at 306. In that case, the defendant participated in a live auction occurring in New York. The New York Court of Appeals found it "highly significant that, on his own initiative, the defendant, in a very real sense, projected himself into the auction room in order to compete with the other prospective purchasers who were there." *Parke-Bernet Galleries, Inc.*, 256 N.E.2d at 508. That is, the nature of the defendant's call placed to New York effectively placed the defendant himself in New York where a transaction was occurring. Reasoning that "[t]his activity far exceeded the simple placing of an order by telephone," the Court of Appeals held that "[t]he mere fact that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts." *Id.* at 508-9. As Judge Leisure has summarized, "*Parke-Bernet* can be read for the proposition that where the interstate communication is the transaction, and not merely a conduit to establish a contract or course of dealing between the parties, then jurisdiction can be based on the communication of the non-domiciliary with New York." *Technology Prods. Int'l v. Integrated Elec., Inc.,* No. 85 CIV. 2111, 1986 WL 2413, *2 (S.D.N.Y. Feb. 19, 1986) (Leisure, J.).

In contrast, where a defendant communicates with a New York plaintiff in connection with a transaction that has little connection to New York other than the

communication itself, the defendant has not transacted business in New York.   *See, e.g.,*
*Sandoval v. Abaco Club on Winding Bay*, 507 F. Supp. 2d 312, 315 (S.D.N.Y. 2007)
(defendant who communicated with plaintiff in New York before and after forming
contract for plaintiff to install irrigation system in the Bahamas did not transact business
in New York); *Digital Lab Solutions, LLC v. Stickler*, No. 06 Civ. 6482, 2007 WL
700821, at *4 (S.D.N.Y. Mar. 7, 2007) ( same where "purpose of defendants' e-mails was
not actively to participate in business in New York, but rather to create a new business in
California"); *Maranga,* 386 F. Supp. 2d at 307 (same with respect to "telephonic
negotiation between a Louisiana party and a New York party regarding the purchase of
real estate in Louisiana pursuant to a contract executed in Louisiana and not containing a
choice of law clause"); *Palace Exploration Co. v. Petroleum Dev. Co.*, 41 F. Supp. 2d
427, 434 (S.D.N.Y. 1998) (same where "contacts with New York consist of telephone
calls, fax transmissions, and correspondence in connection with the negotiation of a
contract" for oil exploration in Oklahoma"); *Int'l Customs Assocs.,* 893 F. Supp. at 1261
(same where defendants negotiated and communicated with defendants in New York for
representation before customs officials in Taiwan); *United States Theatre Corp.*, 825 F.
Supp. at 595-96 (same where plaintiff based jurisdiction on "letters, phone calls, and one
visit" to New York which concerned demolition of property in Washington, D.C. rather
than "a business relationship formed in New York"); *Wilhelmshaven Acquisition Corp. v.
Asher*, 810 F. Supp. 108, 113 (S.D.N.Y. 1993) (same where communications concerned
agreement to purchase German oil refinery).

16

To be sure, since STI communicated with Three Five to request that Three Five ship goods from New York to Maryland, this is not a case where the contract "was to be performed *entirely* outside of New York." *Berkshire Capital Group, LLC v. Palmet Ventures, LLC*, 307 Fed.Appx. 479, 481 (2d Cir. 2008) (emphasis added) (holding that the "mere fact that [defendant] engaged in *some* contact with a New York purchaser does not mean that [defendant] transacted business in New York").   However, in *Parke-Bernet*, the New York Court of Appeals described the "situation where a defendant merely telephones a single order from outside the State" requesting shipment of goods to another state as "a case in which our courts would not have [personal] jurisdiction."  256 N.E.2d at 508; *see also Fischbarg v. Doucet*, 880 N.E.2d 22, 24 (N.Y. 2007) (reaffirming the same).  And if a defendant who has ordered a single shipment of goods from New York has not "participate[d] in any activities localized in the state," *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 788 (2d Cir. 1999), there is little reason to conclude that the same defendant has begun to "actively participate in business transactions in New York" when he makes additional calls or sends e-mails to further refine the terms or check on the status of his order.  *Carlson*, 932 F. Supp. at 78.

As Judge Leisure aptly summarized, and the aforementioned case law demonstrates, the distinction the Court of Appeals drew in *Parke-Bernet* between participation in an auction and ordering goods by telephone is a distinction between transacting and talking.  Since the former establishes personal jurisdiction while the latter does not, it follows that whether a defendant who communicates with a New York plaintiff transacts business in New York turns not on where the parties are talking but on

17

what they are talking about—that is, not on the site of the parties' interaction but on the transaction they are trying to carry out.  For purposes of that inquiry, however, there is little difference between a contract to ship goods outside New York and a contract to provide services or purchase or develop real estate outside New York.  *Kimco Exch. Place Corp. v. Thomas Benz, Inc.*, 824 N.Y.S.2d 353, 354 (2d Dep't 2006) (holding in case involving sale of Florida property that "defendants' acts of faxing the executed contracts to New York and of making a few telephone calls do not qualify as purposeful acts constituting the transacting of business").  True, both kinds of contracts contemplate that a party contacted in New York will provide something of value, but the more important common element is that the "something"—the transaction as opposed to the interaction—is being directed to somewhere other than New York.  In those circumstances, a New York plaintiff's "subsequent conversations and correspondence with defendants is chiefly a function of his New York location rather than a purposeful activity directed toward New York by the defendants." *Longwood Resources Corp. v. C.M. Exploration Co., Inc.*, 988 F. Supp. 750, 752 (S.D.N.Y. 1997).[3]

---

[3] *CT Chemical (USA), Inc. v. Horizons International, Inc.*, 106 F.R.D. 518 (S.D.N.Y. 1985), not cited by Three Five, is arguably to the contrary.  In that case, one of the defendant's principals made a series of telephone calls to the plaintiff's office in New York and later made two separate orders of 840,000 gallons of chemicals.  *See id.* at 519-20.  The court held that the defendant had transacted business in New York.  However, that decision seems difficult to square with the New York Court of Appeals's repeated holdings that no personal jurisdiction exists "where a defendant merely telephones a single order from outside the State" requesting shipment of goods to another state.  *See Parke-Bernet*, 256 N.E.2d at 508; *see also Fischbarg*, 880 N.E.2d at 24.  The same is true of *Lazard Freres & Co. v. Baker, Fentress & Co.*, 1987 WL 9428 (S.D.N.Y. Apr. 9, 1987) which found *CT Chemical* dispositive on similar facts.

Three Five points to two decisions of the New York Court of Appeals, *Fischbarg v. Doucet*, 880 N.E.2d 22 (N.Y. 2007), and *Deutsche Bank Securities, Inc. v. Montana Board of Investment*, 850 N.E.2d 1140 (N.Y. 2006) in which the Court of Appeals found personal jurisdiction where the defendant contacted the plaintiff in New York to request goods or services.  In *Fischbarg*, the defendant called the plaintiff, an attorney, in New York to request legal representation and "repeatedly communicated with plaintiff in New York," including speaking "at least twice per week."  880 N.E.2d at 24-25.  In *Deutsche Bank*, the defendant sent the plaintiff an electronic message requesting information about selling bonds.  *See* 850 N.E.2d at 1141-42.

If those were the only facts relevant to whether the defendant in *Fischbarg* and *Deutsche Bank* had transacted business in New York, there would be some appeal to the suggestion that these decisions stand for the proposition that initiating a transaction with a plaintiff in New York amounts to transacting business under Section 302(a)(1).  However, "[t]he two factors emphasized in *Fischbarg*" were "the ongoing nature of the relationship and defendant's purposeful availment of the laws of New York. . . ."  *Sills v. Ronald Reagan Presidential Found., Inc.*, No. 09 Civ. 1188, 2009 WL 1490852, at *7 (S.D.N.Y. May 27, 2009) (Lynch, J.).

Indeed, in *Fischbarg*, the Court of Appeals repeatedly emphasized that "the case before [the court] concern[ed] defendants' purposeful attempt to establish an attorney-client relationship *here* and their direct participation in that relationship via calls, faxes and e-mails that they projected into this state over many months."  880 N.E.2d at 26 (emphasis added).  In doing so, the Court of Appeals recognized the "general proposition

19

that telephone calls, e-mails and faxes are not, in and of themselves, sufficient long term predicates" but found that the proposition did not govern a case "concern[ing] the solicitation of and participation in an ongoing attorney-client relationship with a New York lawyer." *Id.* at 27 n.5.  In the latter case, defendants had "projected themselves into our state's legal services market." *Id.* at 28.  Similarly, in *Deutsche Bank*, the Court of Appeals noted that "over the preceding 13 months, [the defendant] engaged in approximately eight other bond transactions with [the] employee in New York, availing itself of the benefits of conducting business here. . . ."  850 N.E.2d at 1142.

As such, *Fischbarg* and *Deutsche Bank* fit well into a line of decisions emphasizing that "the purposeful creation of a continuing relationship with a New York corporation." *George Reiner & Co., Inc. v. Schwartz*, 363 N.E.2d 551, 554 (N.Y. 1977). Just as the call into the auction room placed the defendant in into a transaction occurring in New York, an ongoing relationship tethers the defendant to the plaintiff's ongoing commercial activity in New York such that the defendant in effect participates in the plaintiff's transaction of business.  In that circumstance, the defendant's "interstate communication is the transaction," or least part and parcel of the relationship whereby the defendant participates in the plaintiff's transactional activity, "and not merely a conduit to establish a contract or course of dealing. . . ." *Technology Prods. Int'l,* 1986 WL 2413, *2.  That explains why courts in this district have found personal jurisdiction where parties' communications were part and parcel of an extended relationship involving multiple transactions or the provision of services over multiple years. *See, e.g.*, *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 2009 WL 1059647, at *5 (S.D.N.Y.

Apr. 17, 2009) (defendant "voluntarily entered into a long-term business deal to engineer

software for" the plaintiff); *Sills*, 2009 WL 1490852, at *7-*8 (defendant "endeavored to

cultivate an ongoing relationship . . . through a campaign of solicitation in New York by

which it actively projected itself into the state" via meetings in New York and "numerous

letter and telephone solicitations from defendant from 1997 onward"); *Traffix, Inc. v.

Herold*, 269 F. Supp. 2d 223, 226-27 (S.D.N.Y. 2003) (where parties had six-year

ongoing contractual relationship, three meetings in New York and "several telephone

negotiations" amounted to transacting business); *Assil Gem Corp. v. Greyhound Leisure

Servs., Inc.*, 2000 WL 375244, at *3 (S.D.N.Y. Apr. 11, 2000) ("Defendant carried on a

six-year business relationship with a New York domiciliary, utilizing telephone calls, e-

mail and fax transmissions to communicate with its supplier.").[4]

Neither exists here.  STI and Three Five communicated for less than a year

regarding a single discrete order.   And that order, as distinguished from the parties'

interaction about it via telephone and e-mail, had little connection to New York other

than the fact that the goods were to be shipped from New York.   That is insufficient to

establish jurisdiction under New York law.  Accordingly, STI's telephone and e-mail

communications with Three Five in New York do not establish a *prima facie* case that

---

[4] The Court is not aware of any decision finding personal jurisdiction on the basis of
communications regarding a single contract with the plaintiff that occurred during the
course of less than a year.  *Cf. Grimaldi v. Guinn*, 895 N.Y.S.2d 156 (2d Dep't 2010)
(finding personal jurisdiction where defendant garage operator made numerous
communications from October 2005 through November 2007 to a New York plaintiff
regarding restoration of the plaintiff's vehicle).

STI transacted business in New York.  Those communications are therefore insufficient to establish a *prima facie* case for personal jurisdiction.

### 2.  Meetings

Second, Three Five points to two meetings in which Bailey, of STI, met with Peter and Thomas Guan of Three Five in New York in an effort to verify that Three Five had LED chips ready for shipping.  However, these meetings did not occur during contract negotiations and did not result in any contract.  In fact, the undisputed evidence shows that the meetings do not seem to have resulted in anything at all:  Bailey avers— and Guan does not deny—that he was never taken to see the LED chips, the only purpose for the meeting that appears in the record.  (*See* Bailey Aff. ¶¶ 9-13; Bailey Reply Aff. ¶¶ 8-15.)

Courts in this Circuit have repeatedly and virtually universally declined to find that such meetings amount to the transaction of business.  *See Barrett v. Tema Dev. (1988), Inc.*, 463 F. Supp. 2d 423, 430 (S.D.N.Y. 2006) (no personal jurisdiction where parties met in New York to discuss already concluded investment agreement); *Posven, C.A.*, 303 F. Supp. 2d at 399 (same where defendant's officer attended a shareholder meeting regarding issues related to iron facility for which performance bond at issue had been pledged); *Kahn Lucas Lancaster, Inc.*, 956 F. Supp. at 1136 (same where defendant's officer attended six meetings with plaintiff which "played no role in the formation of the relationship between the parties" which occurred outside New York); *Premier Lendings Servs., Inc.*, 924 F. Supp. at 15 (same where "purpose of the meeting . . . was not to negotiate the terms of the agreement, but rather to check on . . . slow

progress"); *PaineWebber Inc.*, 1995 WL 296398, at *3 (same where "meetings did not involve contract negotiations, no contracts were signed," and final meeting was "unproductive"); *Lamco Group, Inc. v. Universal Life Ins. Co.*, 903 F. Supp. 612, 614 (S.D.N.Y. 1995) ("Defendant in the instant case made only one post-contract visit to New York and it too did not result in the sale of defendant's business."); *PaineWebber Inc.*, 748 F. Supp. at 119 (same where plaintiff based jurisdiction on "a series of frequent telephone calls . . . and the one meeting during which a modification of the agreement was memorialized"); *McAny, Inc. v. Carpionato, Corp.,* No. 89 Civ. 4528, 1989 WL 120191 (S.D.N.Y. Oct. 3, 1989); *Sayles Biltmore, Inc.*, 440 F. Supp. at 1013 (stating that one "'trouble shooting' meeting does not amount to a transaction of business"); *Concrete Detailing Serv., Inc. v. Thomsson Steel Co., Inc.*, 41 F. Supp. 1021 (S.D.N.Y. 1976) (same where "there was one visit for part of a day by an officer of defendant at which time the general course of performance of the contract was apparently discussed"). *Cf. Cutco Indus.*, 806 F.2d at 368 (meeting to adjust contractual relationship was "jurisdictionally irrelevant").

The decision of the Court of Appeals of New York *McKee Electric Company v. Rauland-Borg Corporation*, 229 N.E.2d 604 (N.Y. 1967) is also particularly instructive. That case involved a contract for the plaintiff to serve as New York distributor of the defendant's products. "[W]hen questions arose with regard to the exact area that plaintiff's distributorship was to cover, these questions were resolved by mail between the Chicago office of [the defendant] and [the plaintiff] in New York." *Id.* at 606. When another issue arose regarding the plaintiff's performance under the contract, "the

defendant sent its representative . . . into this State" and the representative "stopped at [the plaintiff's] place of business . . . for approximately two hours."  *Id.*  "The meeting consisted of general discussion only during which [the plaintiff] explained his legalistic position. . . ."  The defendant's representative also visited other parties to the dispute in Westchester County.  *See id.*  In those circumstances, the Court of Appeals held that these "contacts" "were so infinitesimal . . .that jurisdiction of the New York courts cannot be sustained.  Otherwise, every corporation whose officers or sales personnel happen to pass the time of day with a New York customer in New York runs the risk of being subjected to the personal jurisdiction of our courts."  *Id.* at 607.

It is just so here.  Like the defendants in *McKee*, who discussed issues regarding the contract via mail to the plaintiff in New York, STI officers called and e-mailed Three Five officers in New York following the formation of the contract.   And just as nothing came of a New York meeting between the defendant's representative and the plaintiff in *McKee* at the plaintiff's offices, nothing came of the short meetings between Bailey and Peter and Thomas Guan.[5]

It is true that one court in this district has held that a non-domiciliary defendant transacted business in New York when, "[i]n an attempt to resolve the disputes between" the parties, the defendant's "president[] traveled to New York to negotiate with [the plaintiff's] principals."  *Clarendon Nat'l Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 517 (S.D.N.Y. 2001).  However, that case is distinguishable from this one for the same

---

[5] While it might be tempting to conclude that *Fischbarg* and *Deutsche Bank* implicitly overruled *McKee* or confined that decision to its facts, the Court of Appeals's citation to *McKee* in *Fischbarg* takes the air out of any such notion.  *See* 880 N.E.2d at 26.

reasons that *Fischbarg* and *Deutsche Bank* are distinguishable, namely, that the defendant "had an ongoing contractual relationship" stretching for several years and involving numerous reinsurance arrangements with "a corporation with its principal place of business in New York."   *Id.*   Indeed, the *Clarendon* court stated that the "meeting [was] relevant to show the ongoing contractual relationship. . . ."   *Id.*

Again, however, no such relationship existed here.  That distinguishes this case from *MasterCard International Inc. v. Federation Internationale de Football Association*, No. 06 Civ. 303, 2006 WL 2320408 (S.D.N.Y. Aug. 10, 2006), cited by STI, where parties with a sixteen year relationship met in New York for two days to negotiate an agreement in the first instance.  *See id.* at *2-*3. [6]  And the same goes for a decision in which the Second Circuit has found personal jurisdiction over a defendant who met with the plaintiff in New York on dozens of occasions over many years.  *Compare Hoffritz for Cutlery*, 763 F.2d at 57, 59-60 (fifty-four meetings over ten years "demonstrated far more than an 'infinitesimal' degree of contact with New York").  Accordingly, the meetings with Bailey are insufficient to establish a *prima facie* case that the STI transacted

---

[6] Once again, the most favorable decision for Three Five is one that it does not cite:  *CT Chemical (USA), Inc.*, *supra*.  In that case, one of the defendant's principals made as series of telephone calls to the plaintiff's office in New York and later made two separate orders of 840,000 gallons of chemicals.  *See* 106 F.R.D. at 519-20.  In addition, later the same month, one of the defendant's principals met in New York for "a substantive discussion relating to the timing of delivery and the costs of storage" during which "an agreement that [the defendant] would use its best efforts to take possession by" an agreed upon date "was reached."  *See id.* at 520-21.  In those circumstances, the court held that the defendant had transacted business in New York.  However, that decision seems distinguishable on the ground that the parties' meeting amounted to a continuation of efforts to delineate the terms of the agreement rather than a meeting to verify performance of an agreement directed outside New York.  In any event, *CT Chemicals* is against the weight of authority in this Circuit.

business in New York and therefore insufficient to establish a *prima facie* case of personal jurisdiction.

### 3. Business Card

Finally, Three Five notes that Bailey "provided a Scram Technology business card . . . which included a Brooklyn, New York business address and New York telephone contact information."  (Pl.'s Opp'n at 5; *see also* P. Guan Aff. ¶ 17.)  Bailey denies this and avers that his STI business card lists STI's Maryland address, while his "private social card" lists his personal telephone number in "New York, NY."  (*See* Bailey Reply Aff. ¶ 9, Exs. 1, 3.)

Bailey's explanation is sensible, but it is far from the only one that could be drawn from the record.  Peter Guan avers that Bailey presented him and Thomas with a "Scram Tech business card . . . which included his Brooklyn, New York office address and telephone number."  (P. Guan Aff. ¶ 17.)  The "private social card" that Bailey has produced contains no address at all, and refers to "New York, NY" rather than "Brooklyn, New York."  (*See* Bailey Reply Aff. Ex. 3.)  That casts doubt on Bailey's explanation that his private social card could explain Guan's statement regarding an STI business card with a Brooklyn address.  Perhaps Guan is simply mistaken about the card that he received, and the fact that Three Five has not furnished the Court with a copy of the card renders his recollection somewhat suspect.  But the Court cannot make such a credibility determination at this stage of the litigation.  Rather, in considering a defendant's motion to dismiss for lack of personal jurisdiction, "all pleadings and affidavits are construed in the light most favorable to plaintiff, and where doubts exist,

they are resolved in the plaintiff's favor." *Hoffritz for Cutlery, Inc.*, 763 F,2d at 57. Accordingly, the Court must credit Peter Guan's sworn statement that Bailey presented an STI business card with a Brooklyn address and told Guan that "he conducts his Scram Tech business from his office located in Brooklyn, New York." (Guan Aff. ¶¶ 17-18.)

Yet what follows from those facts? Providing a business card listing a Brooklyn address hardly amounts on its own to transacting business in New York. And since Peter Guan merely avers that Bailey reported conducting certain unspecified STI business from a Brooklyn address, even if such business amounted to transacting business for purposes of Section 302(a)(1), the Court cannot determine whether Three Five's breach of contract claim arises from that business. Without knowing what the business is, the Court cannot conclude that "the cause of action is sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject the defendants to suit in New York." *Hoffritz for Cutlery, Inc.*, 763 F.2d at 59.

The same dearth of evidence regarding Bailey's activities also means that Three Five has not established a *prima facie* case that STI, via Bailey, "engaged in 'continuous, permanent, and substantial activity in New York.'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)). Such activity could establish general jurisdiction pursuant to Civil Procedure Law and Rules Section 301. Under that section, "a corporation is doing business and is therefore present in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York not occasionally or

27

casually, but with a fair measure of permanence and continuity."  *Wiwa*, 226 F.3d at 95

(quotation marks omitted).[7]   In certain circumstances, jurisdiction has been predicated

upon activities performed in New York for a foreign corporation by an agent."  *Id.*

However, "when a defendant has no permanent locale in the state, and makes no

substantial and continuous sales or shipments in the state, it is highly unlikely that it will

be found to be 'doing business.'"  *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d

563, 571 (S.D.N.Y. 2006) (Hollwell, J.) (quoting Weinstein, Korn & Miller, *New York

Civil Practice,* ¶ 301.16 (2005)).

Without any record of what Bailey's activities were, the Court cannot conclude

that those activities were continuous, permanent, or substantial.  True, Bailey lives in

New York and, crediting Guan's account of what Bailey told him, "conducts Scram Tech

business from his office located in Brooklyn, New York."  (P. Guan Aff. ¶ 18.)  And that

might be relevant to showing that STI "has an office in the state" or "has individuals

permanently located in the state to promote its interests."  *Wiwa*, 226 F.3d at 98.  But

Guan's claim is far from sufficient to show either, never mind that general jurisdiction is

proper.

*Zibiz Corporation. v. FCN Technology Solutions*, 2011 WL 837757 (E.D.N.Y.

Mar. 2, 2011), is closely on point.  In that case, the defendant's officer averred

---

[7] Three Five does not explicitly argue that Bailey's activities established general
jurisdiction, but it does state that STI has been "doing business" in New York.  (*See* Pl.'s
Opp'n at 3.)  It seems that Three Five has conflated Sections 301 and 302, but given that
the Court must draw every inference in favor of the plaintiff, the Court will engage in the
general jurisdiction analysis.

that, at all relevant times, defendant: was a Maryland corporation with a principal place of business in Maryland; had no offices or registered agents in New York; was not registered to do business in New York; derived no substantial revenue from New York customers; did not solicit customers who live in New York, market its services in New York or conduct any other work aimed at attracting or securing New York customers; did not own real property in New York; did not maintain a bank account, mailing address or telephone listing in New York; did not have any individual permanently located in New York in order to promote defendant's business interests here; had only one (1) employee who lived in New York but who "telecommuted" from home, worked on projects throughout the United States, and did not solicit customers or sales opportunities in New York, and whose business activities were not directed at New York; and never visited New York for the purposes of negotiating or executing any agreement with plaintiff.

*Id.* at * 6.  On those facts, the court held that "the listing of a New York address on defendant's website does not establish that defendant actually had an office in New York in light of [defendant]'s explanation that the address so designated is the home address of its one employee who lives in New York and 'telecommutes,' and absent any evidence that defendant has any ownership or leasehold interest in the employee's home, pays the employee rent, or otherwise uses the home for its own purposes."  *Id.*  The court further held "that the fact that one of defendant's employees resides in New York and telecommutes from his home, without more, is insufficient to confer general personal jurisdiction over defendant pursuant to Section 301."  *Id.*

It is just so here.  There is little basis in the record to conclude that Bailey's office was an STI office.  While the Court assumes that Bailey's STI business card in fact listed his Brooklyn address, there is no evidence that Bailey's office was, in fact, an STI office in the sense that the company owned or otherwise paid for the office.  In the absence of such evidence, the Court cannot conclude that Bailey's workplace was an STI office.  *See Loria & Weinhaus, Inc. v. H.R. Kaminsky & Sons, Inc.,* 495 F. Supp. 253, 257 (S.D.N.Y.

29

1980) ("The New York address listed on the defendant's stationery does not establish that the company actually had an office in the state. . . . The plaintiff presents no evidence that the defendant is named on the lease, pays rent, or has used and is using the space for its own purposes.").  And the Court certainly cannot hold that Bailey's representation alone suffices to establish general jurisdiction because even "the presence of . . . an office is not dispositive." *Matter of Rationis Enter., Inc. of Panama,* 261 F.3d 264, 270 (2d Cir. 2001).

Indeed, finding general jurisdiction would be particularly inappropriate where there is no evidence as to exactly how continuously and systematically Bailey acted in New York on behalf of STI.  *Cf. Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 650 (Tenn. 2009) ("In this age of electronic communications, telecommuting, and distributed management, the fact that [defendant's] officers and directors maintain offices in Tennessee does not, by itself, lead to the conclusion that the corporation has continuous and systematic contact with Tennessee" where the plaintiff "failed to demonstrate the extent to which [the defendant's] officers and directors were conducting the corporation's day-to-day business operations from their offices in Tennessee.").  Guan merely avers that Bailey represented that he conducted STI business from his Brooklyn address.  But the only evidence in the record about what that business was is Bailey's sworn statement that he only engages in telecommunications with clients outside New York.  Drawing every inference in favor of Three Five does not require ignoring evidence that Three Five does nothing to rebut.  And the fact that STI had one agent living in New York making some unspecified number of telephone calls to clients outside New York does not establish that STI itself "engaged in 'such a continuous and systematic course of activity

that it can be deemed to be 'present' in the state of New York.'" *Anderson v. Indiana Black Expo, Inc.*, 81 F. Supp. 2d 494, 500 (S.D.N.Y. 2000) (quoting *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 50-51 (2d Cir. 1991)) (other quotation marks omitted).  *See Ladd v. Research Triangle Inst.,* No. 05–cv–02122–LTB–OES, 2006 WL 2682239, at *7 (D. Colo. Sept. 18, 2006) (finding no general jurisdiction where defendant had "six employees who were based in Colorado . . . all of whom telecommute" but had local office, property, registered agent, advertising, or bank accounts in the state).[8]

---

[8] Nor can Bailey's "isolated" meetings with Peter and Thomas Guan establish general jurisdiction.  *See Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 550 (S.D.N.Y. 2005).

## CONCLUSION

For the reasons given above, Defendants' motion [8] to dismiss the complaint for lack of personal jurisdiction is GRANTED.

SO ORDERED.

Dated: New York, New York
　　　　November 21 , 2011

　　　　　　　　　　　　　　　　　　　Richard J. Holwell
　　　　　　　　　　　　　　　　　　United States District Judge

32